UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BOAT RAISING AND RECLAMATION,

                Plaintiff,

vs.                        Case No.  2:06-cv-78-FtM-29DNF

VICTORY, a 56' Dania Custom Boat,
her engines, tackle, equipment,
apparel, appurtenances, etc., _in rem_, ANDREW PATTERSON, and ALLSTATE
INSURANCE COMPANY, individually, _in personam_,

                Defendants.

_____

**OPINION AND ORDER**

_____This matter came before the Court on October 30 and 31, 2007 for a non-jury trial of an Amended Complaint (Doc. #23).  Both sides thereafter submitted Amended Proposed Findings of Fact and Conclusions of Law (Docs. ## 64, 65) and a Joint Stipulation (Doc. #66), and plaintiff filed a Notice of Supplemental Authority (Doc. #67).  Plaintiff primarily seeks a salvage award against a vessel's owner and insurance company for plaintiff's efforts in salvaging the vessel during the aftermath of Hurricane Charley.  An alternative _quantum meruit_ claim is also included.  The _in rem_ claim against the vessel was dismissed by agreement of the parties (Doc. #48).

**I.**

Defendant Andrew Patterson (Patterson) is a resident of Marco Island, Florida who also owns a horse training center outside of Ocala, Florida.  In 2002 Patterson purchased the 1977 M/V VICTORY (M/V VICTORY or the Vessel) for the equivalent of approximately $160,000.00 and was its owner at all material times.  The M/V VICTORY is a 56 foot registered length (about 65-70 feet overall length) aluminum vessel weighing approximately 100,000 pounds when not fully fueled; it has two decks and is about 25 foot tall; it has a draft of approximately 3.5 feet, twin diesel main engines, rudders, and propellers, and a capacity of 140 persons.  While owned by Patterson, the Vessel was routinely moored at a dock in a canal behind his Marco Island residence.  As accurately depicted in Plaintiff's Exhibit 5, the canal is between Caxambas Drive, on which Patterson and his family reside, and Scott Drive.

At all relevant times Patterson had a valid marine policy of insurance on the Vessel with defendant Allstate Insurance Company (Allstate).  Plaintiff's Exh. 7; Defendants' Exh. A. The policy provided coverage up to $335,000 actual cash value for physical loss to the Vessel and up to $33,500 for physical loss to the Vessel's equipment; watercraft liability coverage was up to $300,000.  The policy also provided additional coverage of up to $100 for the reasonable expense Patterson incurred following emergency service to the Vessel for towing if it became stuck.

Approximately a week prior to the arrival of Hurricane Charley, Patterson, his wife and two minor children traveled to their Ocala area horse training center to avoid the hurricane. Patterson caused the Vessel to be tied in the canal by approximately 12-15 rope lines to his dock and various trees at his residence; he also hired someone to drop anchors prior to the hurricane's arrival, although the person failed to do so.  No one remained aboard the Vessel as the hurricane approached.

Hurricane Charley struck Marco Island, Florida at full force at approximately 1:30 p.m. on August 13, 2004, with winds in excess of 100 miles per hour.  The hurricane winds caused the Vessel to break away from its mooring, destroying the dock in the process. Winds and waves pushed the Vessel to the end of the canal; the Vessel hit and damaged other docks and boats on its way.  Gerald Hautman, a neighbor, took pictures of the Vessel proceeding backwards down the canal during the hurricane, and reported the matter to the Marco Island Police Department.  Plaintiff's Exh. 3.

Plaintiff Boat Raising and Reclamation (Boat Raising or plaintiff) is the fictitious name of one of several companies associated with County Rescue Towing & Salvage, Inc., a Florida corporation with its principal place of business in Naples, Florida.  Andrew Schwartz (Schwartz) has been the owner and president of Boat Raising since its inception and has been a professional salvor since about 2000.  Schwartz is a well-

qualified, skilled salvor with a well-rounded background in related fields which he utilizes in his salvage business.  Through a family of companies, Schwartz has access to two 27 foot Boston Whalers (which he values at about $110,000 each) equipped with specialized salvage and safety related gear (which he values at $20-25,000 each).  Schwartz also utilizes both a Ford truck (which he values at $40,000) and a Chevy truck (which he values at $15,000) along with equipment in the trucks valued at a total of $100,000.  Boat Raising does not have full time employees, but uses workers as the jobs require; additionally it owns no property or equipment, but leases such items as needed from Schwartz's other corporations.  One of Schwartz's companies also had the license from Collier County to provide vessel-assist towing services to boaters as needed.

**A.**

Schwartz testified that in the late morning hours[1] of August 13, 2004, the Marco Island Police Department called and notified Schwartz that the Vessel had broken free from its moorings and was lodged on a seawall at the end of a canal near Scott Drive.  When

---

[1]While not critical to the Court's findings, the Court concludes that Schwartz is incorrect in his estimate of the time the relevant events began.  It appears more likely that his involvement in this matter began near 4 p.m.  The police report indicates that Hurricane Charley struck Marco Island at about 1:30 p.m., and Schwartz's telephone records show five telephone calls to the Marco Island Police Department (239-389-5050) not long after 4 p.m.  Plaintiff's Exh. 6.

Schwartz received the call, he was at a safe location inland about 15 miles from the Vessel.  The winds had abated, and Schwartz estimated winds of 40-50 miles an hour and rain.  Schwartz testified that the police department gave him the cellular telephone number for the Vessel's owner, Andrew Patterson, and had given Patterson his (Schwartz's) telephone number.  Schwartz attempted to contact Patterson, but because of the weather telephone communications were difficult.  Schwartz immediately mobilized his equipment and crew and left his inland location pulling the BLACK DIAMOND with the Ford; two employees left with the Chevy from another location after being called by Schwartz.

Schwartz testified that while he was enroute to the Vessel he and Patterson spoke by telephone.  Schwartz testified that Patterson said the City Manager had told Patterson about the Vessel, and Schwartz told Patterson he would report back to Patterson when he got to the Vessel.  Schwartz testified that Patterson stated he had Allstate insurance and would get Schwartz the insurance information when he got back to town.  Based on this conversation, Schwartz believed he had the job and started calling his crew.[2]  Schwartz estimated that this first conversation with Patterson occurred between midday and 2 p.m., but could not

---

[2]On cross examination Schwartz testified that his first contact with Patterson was _prior_ to leaving the inland location, and that Patterson stated he was covered by Allstate and that Schwartz should do what he needed to recover the Vessel.

remember exactly.[3] Patterson denied that this conversation took place, and asserted that he did not speak with Schwartz at all until later in the day.

Schwartz testified that driving to Marco Island was hazardous because of debris and numerous downed power lines. Schwartz took the BLACK DIAMOND to a marina with a boat ramp about three-quarters of a mile from the Vessel, and met his two employees. After clearing debris from the boat ramp area for about 30 minutes, Schwartz launched the BLACK DIAMOND and sent his two employees to the Scott Drive location in the trucks. Schwartz estimated the diminishing winds at 40 miles per hour with bands of rain and 3-6 foot waves, and found lots of debris in the water.

Schwartz piloted the BLACK DIAMOND to the canal adjacent to Scott Drive, which also had a large amount of debris. Schwartz's two employees arrived two to three minutes before Schwartz, and had accurately described the Vessel's situation to Schwartz by radio. Schwartz testified that at the time of his arrival the winds were under 40 miles per hour and the waves were 3-5 feet at the end of the canal, and there were still heavy bands of rain. Schwartz described the canal as being between 75 and 90 feet wide and narrower at the end with the Vessel, and less than 1,000 feet in length. While it was low tide, the photographs apparently taken by Mr. Hautman (Plaintiff's Exh. 3, 4) show that the water level was

---

[3]See footnote 1.

still near the top of the sea wall.  Patterson would testify that
this was the usual water level at high tide.

Schwartz testified he observed the Vessel lodged a third
forward on top of a seawall on its starboard aft side with a
noticeable list to the port side (using a clock, listing to the 10
o'clock position).  Heavy damage had been done to the seawall.  The
Vessel's stern was somewhat unstable and was being slightly beat up
by the waves; a sheen of diesel fuel/oil was on the deck.  There
was heavy debris in the canal.  Schwartz was concerned about the
starboard side and the integrity of the hull, and that the Vessel
would roll to port in the receding tide and cause a major fuel
spill.  Schwartz testified that the listing to port was getting
worse as the storm surge and wind subsided.  There was a small boat
moored at a dock about 15 feet from the Vessel.  Schwartz testified
that he took photographs of the Vessel in this condition and turned
them over to his attorney, but no such photographs were ever
introduced as evidence.

Schwartz testified that he spoke with Patterson while he was
setting up to pull the Vessel, and told Patterson the situation
prior to Schwartz pulling it off the seawall.  Schwartz testified
that Patterson authorized him to go ahead and remove the Vessel
from its grounded position and return it to his dock, and that
Patterson said he had Allstate insurance to cover the situation.

Schwartz testified that Patterson called several times, including during the work itself when Schwartz couldn't speak with him.

Using sheets of plywood, ropes and anchors, and the engines of the BLACK DIAMOND to dredge around the Vessel, Schwartz and his two employees were able to get the Vessel off the seawall without damage to the Vessel. Schwartz estimated this was late aftrnoon or early evening. The wind and waves had died down by this time, and Schwartz pulled the Vessel to the end of the canal and tied it to the trees at Patterson's house where the Vessel had been before the hurricane. The Vessel had no significant exterior damage.

Schwartz testified he called Patterson, told him the Vessel was tied in position and requested that Patterson's representative watch over the vessel. Patterson responded that it was not necessary because he would be there about midnight. Schwartz disagreed, and called the Marco Island Police Department and advised them of the situation with the Vessel. Schwartz and his employees then left to go to their next job. Schwartz testified that Patterson never told him not to do the work or to stop what he was doing. Schwartz never gave Patterson a price for the work because he did not know what the job would require.

Schwartz called Patterson afterwards about the insurance, and was told an adjustor was assigned. Schwartz turned the matter over to his attorney, because Schwartz was busy with other hurricane related matters in that busy hurricane season. Schwartz testified

that he feels the value of the Vessel was approximately $350,000 and that the reasonable salvage is $75,000. Post-trial submissions asserted that the value of the Vessel was $360,000 on August 13, 2004, and requested a salvage award of 17% plus a 5% enhancement for a total of $79,200.00.

**B.**

Patterson testified that a little after 4 p.m. he and his wife were called in Ocala by the City of Marco Island City Manager Bill Moss (Moss) and notified that the police had reported his vessel had broken free and was at the end of the canal up against a seawall. Using Naples area telephone books he and his wife had in Ocala, Patterson called several maritime tow companies to secure assistance with the Vessel. At 6:01 p.m. (according to telephone records) Patterson made contact with Don Cramer (Cramer), a subcontractor for Boat USA, and told Cramer that his vessel had broken from its mooring and was at the end of his canal. Patterson testified that for $700-800 Cramer agreed to check out the Vessel in the canal and to guard it until Patterson returned from Ocala later that evening.

Cramer testified by deposition that Patterson wanted him to put the vessel back where it belonged, and Cramer agreed to go look at the Vessel and get back with Patterson. Cramer arrived at the canal approximately 15-20 minutes later, and observed that the Vessel was washed up against the mangroves sitting on some sand.

Cramer did not remember a seawall, but testified that the mangroves would have been hiding the seawall. Cramer testified that the Vessel was listing, but not too badly at no more than 10-15 degrees to port with the waterline showing. Cramer estimated the winds were about 10-15 miles per hour. Cramer testified that one of Schwartz's employees was standing guard over the Vessel and told Cramer that Schwartz had gotten the job and was going to pull the Vessel back to Patterson's house. At the time, Schwartz had not yet arrived with the BLACK DIAMOND. Cramer called Patterson and stated what he had been told, and Patterson stated he had not given Schwartz the job. Cramer gave Patterson Schwartz's telephone number. Cramer believed he spoke to Patterson again later, and Patterson said Schwartz was pulling the boat at that time; telephone records show calls from Patterson to Cramer at 7:10 p.m. and 7:32 p.m. Cramer testified that Patterson did not offer him any money to look after the boat.

Patterson testified he first spoke with Schwartz at 7:13 p.m. and told Schwartz he wanted the boat secured and left alone and not moved because he would take care of it himself when the tide was higher. Patterson was afraid of damage being inflicted on the Vessel if moved. Patterson testified that he was cut off because of the bad weather quite a few times, and had two or three conversations with Schwartz. Patterson testified that when he re-contacted Schwartz and told Schwartz to leave the Vessel alone,

Schwartz said he was already moving the Vessel and could not talk on the phone and hung up.  Patterson testified that he felt he had no choice in the matter, that the telephone conversations occurred during a confusing situation, and that Schwartz was trying to help him.  Patterson testified he never authorized Schwartz to salvage the Vessel or move it back to the end of the canal, but also never told him to stop or called the police to stop Schwartz.

Patterson's telephone records show a flurry of calls between 7:04 p.m. and 8:39 p.m. between Patterson's Ocala land-line (352-748-2007) or his wife's cellular phone (239-825-9050) and the Marco Island Police Department (239-389-5050), Cramer (239-389-7111), or Schwartz (239-389-5578 or 239-389-5577 or 238-825-8562):

| Time: | From: | To: | Length: |
|---|---|---|---|
| 7:04 p.m. | Patterson's Ocala land line | Marco Island Police Department | 2 min. |
| 7:08 p.m. | Patterson's Ocala land line | Schwartz | 1 min. |
| 7:10 p.m. | Patterson's cellular phone | Cramer | 2 min. 53 sec. |
| 7:13 p.m. | Patterson's cellular phone | Schwartz (his records confirm) | 1 min. |
| 7:14 p.m. | Patterson's Ocala land line | Marco Island Police Department | 5 min. |
| 7:23 p.m. | Patterson's cellular phone | Schwartz | 3 min. 30 sec. |
| 7:27 p.m. | Patterson's cellular phone | Marco Island Police Department | 1 min. 34 sec. |

| 7:32 p.m. | Patterson's cellular phone | Cramer | 3 min. 26 sec. |
| 7:59 p.m. | Patterson's Ocala land line (two calls) | Schwartz (his records confirm) | 1 min. 1 min. |
| 8:39 p.m. | Patterson's Ocala land line | Schwartz | 1 min. |
| 8:40 p.m. | Patterson's Ocala land line | Schwartz (his records confirm) | 4 min. |

Patterson never saw the Vessel at the end of the canal. Patterson returned to Marco Island a little after midnight and found the Vessel in front of his residence. Patterson testified he had no complaints about the quality of Schwartz's work or the manner in which the salvage was physically accomplished. Patterson testified that he did not believe the Vessel was on top of the seawall because there was no damage to that side of the Vessel and no scratches. Patterson also testified, however, that he believed his Vessel caused the physical damage observed to the top of the seawall.

Patterson sold the Vessel in December 2005, for approximately $165,000.

Additional facts and resolution of conflicting testimony will be set forth below as needed to address specific issues.

**II.**

Title 28 U.S.C. § 1333 grants federal courts subject matter jurisdiction of all cases involving admiralty and maritime claims. A salvage claim is within the admiralty jurisdiction of the federal

courts.  <u>Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned</u> <u>Sailing Vessel</u>, 640 F.2d 560, 566 (5th Cir. 1981)[4].  The Court has jurisdiction of the dispute and the parties in this case.

"The law of salvage generally governs efforts to save vessels in distress.  Under the law of salvage, rescuers take possession of, but not title to, the distressed vessel and its contents.  A court then fashions an appropriate award for the salvors' services."  <u>Int'l Aircraft Recovery v. Unidentified Wrecked &</u> <u>Abandoned Aircraft</u>, 218 F.3d 1255, 1258 (11th Cir. 2000).  Three kinds of salvage services have been recognized.  "Salvage services are either (1) voluntary, wherein the compensation is dependent upon success; (2) rendered under a contract for a per diem or per horam wage, payable at all events; or (3) under a contract for a compensation payable only in case of success."  <u>The Elfrida</u>, 172 U.S. 186, 192 (1898).  As discussed in more detail below, the first type, also referred to as "pure salvage," is at issue in this case.

In order to establish a claim for a pure salvage award, plaintiff must show the following elements by a preponderance of the evidence: (1) A maritime peril from which the ship or other property could not have been rescued without the salvor's assistance; (2) a voluntary act by the salvor - that is, the salvor

---

[4]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

must be under no official or legal duty to render the assistance; and (3) success in saving, or in helping to save, at least part of the property at risk.  The Sabine, 101 U.S. 384 (1879); Flagship Marine Servs. v. Belcher Towing Co., 966 F.2d 602, 604-05 (11th Cir. 1992); Klein v. Unidentified Wrecked & Abandoned Sailing Vessel, 758 F.2d 1511, 1514-15 (11th Cir. 1985).  If these three elements are established, the Court calculates the amount of the salvage award.

"Awards for performance of salvage services are not limited to a strict quantum meruit measure of the value of the services performed.  Rather, the award is calculated to include a bounty or premium based upon the risk involved in the operation and the skill with which it is performed. . . . compensation is given as a reward for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property."  Offshore Marine Towing, Inc. v. MR23, 412 F.3d 1254, 1257 (11th Cir. 2005)(citations omitted).  In evaluating the salvor's skill and risk, the following factors are considered: (1) The labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the

value of the property saved; and (6) the degree of danger from which the property was rescued.  Offshore Marine Towing, Inc., 412 F.3d at 1257 (citing The Blackwell, 77 U.S. (10 Wall.) 1, 13-14 (1869)).  The calculation of each salvage award is specific to the facts of each case, and these factors are a guide to measure both the cost to the salvors of performing the service and the benefit to the salvee.  Offshore Marine Towing, Inc., 412 F.3d at 1257. The amount of salvage awarded is largely a matter of fact and discretion, which cannot be reduced to precise rules, after consideration of all the circumstances.  The Connemara, 108 U.S. 352, 359 (1883).

### III.

**A.  *In Personam* Proceedings/Salvor's License:**

Defendants argued at the close of the evidence that plaintiff could not proceed on its *in personam* claims in the absence of an *in rem* claim against the Vessel.  The Court disagrees.  "Suits for salvage may be *in rem* against the property saved or the proceeds thereof, or *in personam* against the party at whose request and for whose benefits the salvage was performed."  The Sabine, 101 U.S. at 386.  See also Treasure Salvors, Inc., 640 F.2d at 567 ("Thus, the salvor may assert his right to a salvage award either in an *in rem* proceeding against the salved vessel or cargo or in an *in personam* proceeding against the owner of the salved property.")  Therefore,

-15-

plaintiff's *in personam* salvage claim may proceed against Patterson and Allstate.

Defendants also argued that plaintiff was required to have a license pursuant to 46 U.S.C. § 80102, and there was no evidence establishing possession of such a license.   Section 80102 was not effective until October, 2006, and all the events at issue in this case predate the requirement for a salvor's license.   Therefore, the Court concludes that the lack of a license does not preclude the claims in this case.

**B.   Elements of Pure Salvage Claim:**

**(1) Maritime Peril:**

Plaintiff must establish the existence of a maritime peril from which the ship could not have been rescued without the salvor's assistance.  Defendants argue that no such maritime peril has been shown in this case.

"[T]he perils out of which a salvage service may arise are all of such perils as may encompass a vessel when upon waters which are within the admiralty jurisdiction of the United States; . . ." Simmons v. The Steamship Jefferson, 215 U.S. 130, 139 (1909).  To constitute a maritime peril, the danger need not be imminent, but only reasonably apprehended.  In The Leonie O. Louise, 4 F.2d 699 (5th Cir. 1925), a schooner was driven from her anchorage by a storm and went aground on the bank of the Hillsboro River.  Four other vessels were in close proximity, it was low tide, and there

was not sufficient rise of the tide to float the vessel.  The Court found that salvage services were performed, stating: "The fact that she had been driven up on the bank by the action of the wind and waves proves conclusively the possibility of further damage from the same sources.  Although the danger was not imminent, it was reasonably to be apprehended, and there was pressing necessity for prompt action to return the schooner to the water."  Id. at 700. See also Fort Myers Shell & Dredging Co. v. Barge NBC 512, 404 F.2d 137, 139 (5th Cir. 1968); Irvine v. The Hesper, 122 U.S. 256 (1887)(vessel which ran aground lightly and remained upright is in peril so as to justify salvage).

Only two trial witnesses observed the Vessel first hand at the end of the canal, Schwartz and Cramer.  While their testimony was not identical, both stated the vessel was hard aground, either was or may have been on the seawall, and was listing noticeably to port while in close proximity to a smaller boat tied to a piling.  While Schwartz testified he had photographs of the Vessel, he introduced none.  No one authenticated the photographs introduced by stipulation of counsel, or gave any information beyond what can be observed in the photographs.  The Court finds Schwartz's speculation that some of the photographs were taken after he had pulled the Vessel off the seawall but before he had pulled it from the end of the canal to be reasonable in the absence of testimony to the contrary.  Thus, defendants expert's opinion as to a lack of

peril was based in large part on photographs which did not accurately depict the actual peril, and is rejected by the Court.

Based upon evidence it finds credible, the Court finds as matters of fact that the wind and waves caused by Hurricane Charley pushed the Vessel to the end of the canal, where it lodged on top of the seawall.  The Vessel was listing to port in the manner described by Schwartz, and had a diesel fuel/oil sheen on the deck. A much smaller vessel was tied in close proximity to the Vessel, and would have been damaged had the Vessel turned over.  While it was low tide, the water at the end of the canal was near the top of the seawall, which was the typical level at high tide.  While Patterson believed he could float the Vessel when high tide came, the Court finds this could not have been done, since the receding hurricane surge and the rising tide would have essentially offset and would not have been sufficient to float the vessel.  The Court concludes as a matter of law that plaintiff has established the existence of a maritime peril from which the Vessel could not have been rescued without the plaintiff's assistance.

(2) **Voluntary Act:**

"So long as the services are voluntary and are not rejected by those in authority a [salvor] is eligible for salvage award in proportion to the value of his contributory efforts."  Legnos v. M/V Olga Jacob, 498 F.2d 666, 672 (5th Cir. 1974).  Thus, plaintiff must establish that its conduct was a voluntary act, that is, that

it lacked an official or legal duty to render the assistance, and that the assistance was not rejected by Patterson. The Court concludes that there was no official or legal duty by Schwartz to render the assistance, and that the assistance was not rejected by Patterson.

To determine whether services rendered by a salvor are voluntary, "nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." Flagship Marine Servs, 966 F.2d at 605 (quoting The Camanche, 75 U.S. (8 Wall.) 448, 477 (1869)). See also Potomac Steam-Boat Co. v. Baker Salvage Co., 123 U.S. 40, 49-50 (1887). "The fact that a shipowner requests a salvage service and that the salvors in response furnish it, *standing alone*, does not create an implied contract so as to defeat a salvage claim." Flagship Marine Servs., 966 F.2d at 605 (quoting Fort Myers Shell & Dredging Co. v. Barge NBC 512, 404 F.2d 137, 139 (5th Cir. 1968)). Even if there is no contract to pay a given sum for services, there can be a binding oral engagement to pay for services, whether or not they prove successful, which can bar a salvage claim. Flagship Marine Servs., 966 F.2d at 605-06.

The Court finds as a matter of fact that there was no contractual obligation created by the conversations between Schwartz and Patterson, even if Schwartz's testimony concerning

such conversations is fully credited.  No contract was created because there was never any meeting of the minds as to material elements, such as price.  At best, the parties were in negotiations which never culminated in a contract.  Additionally, there was no evidence that Schwartz was obligated to provide assistance under his sea tow assistance license with Collier County.

Patterson argues, however, that there can be no salvage, even if voluntary, because he rejected Schwartz's services.  The applicable legal principles are well settled.

Because the law of salvage is intended to encourage rescue and aid must often be given quickly when ships are in peril, "when a ship is in distress and has been deserted by its crew, anyone can attempt salvage without the prior assent of the ship's owner or master." Int'l Aircraft Recovery, 218 F.2d at 1261.  "Put another way, when a salvor comes upon a vessel in distress, he can assume the owner would want assistance.  The owner of the derelict vessel cannot contest the salvor's right to attempt a rescue by claiming after the fact that the assistance was unwanted." Id.  "While salvage cannot be exacted for assistance forced upon a ship, her request for or express acceptance of the service is not always essential to the validity of the claim.  It is enough if, under the circumstances, any prudent man would have accepted." Merritt & Chapman Derrick & Wrecking Co. v. United States, 274 U.S. 611, 613 (1927).  This does not mean that an owner cannot reject salvage in

a timely fashion.  Int'l Aircraft Recovery, 218 F.3d at 1261.  The law of salvage permits "the owner of a vessel in marine peril to decline the assistance of others so long as only the owner's property interests are at stake."  Id. at 1262.

The Court finds that there was no timely rejection of Schwartz's services.  Even viewing the evidence in the light most favorable to Patterson, his testimony was that he told Schwartz not to move the Vessel while Schwartz was in the process of moving it. This comes too late to reject salvage.

**(3) Success:**

Plaintiff must establish its success in saving, or in helping to save, at least part of the property at risk.  "Success is essential to the claim," and if the vessel is not saved no compensation can be allowed.  The Blackwall, 77 U.S. at 12.  It is undisputed that the Vessel was successfully removed from its grounded position and returned to Patterson's house without additional exterior damage.  At the conclusion of the trial defendants stated they were not pursuing their Counterclaim (Doc. #20) alleging negligent salvaging, and the Court finds no evidence which would have supported such a claim.  Therefore, plaintiff has established that it was successful in its salvage efforts.

**C. Calculation of Salvage Award:**

**(1)  The labor expended by the salvors in rendering the salvage service:** The Court finds that Schwartz and his two

employees expended 4-5 hours in connection with the salvage of the Vessel.  This includes the travel time to arrive at the location, the removal of the Vessel from the seawall, returning it to Patterson's residence, and securing it at that location.

**(2) The promptitude, skill, and energy displayed in rendering the service and saving the property**: Plaintiff responded promptly in post-hurricane conditions after being informed of the Vessel's situation by the Marco Island Police Department.  Schwartz and his crew demonstrated skill, energy, and creativity in removing the Vessel from the seawall, pulling her from the seawall, and returning her to Patterson's residence.

**(3) The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed**: Plaintiff utilized one 27 foot Boston Whaler and two trucks, all of which contained substantial amounts of specialized equipment.  While the equipment was not utilized in this case, it was available if needed.  There was minimal danger to the two vehicles, and some danger to the Boston Whaler.

**(4) The risk incurred by the salvors in securing the property from the impending peril**: The risks incurred by plaintiff was low. The hurricane had passed by the time the Vessel was moved, the winds had died down considerably, and the waves were likewise not a major factor.

**(5)  The value of the property saved**: The Vessel had been purchased in 2002 for approximately $150,000; it was insured in 2004 for $335,000 plus $33,500 for equipment; and it was sold in 2005 for $165,000.  Insured value is not definitive, but is at least some evidence of fair market value. Commercial Union Ins. v. M/V Bill Andrews, 624 F.2d 643, 649 (5th Cir. 1980).  "It is common knowledge that, wittingly or unwittingly, items of property are frequently over- or under-insured.  Thus, while the amount of coverage on an item may be relevant to establishing its value, it clearly does not lay a floor beneath it." Signal Oil & Gas Co. v. The Barge W-701, 654 F.2d 1164, 1173 (5th Cir. 1981); Ocean Servs. Towing & Salvage, Inc. v. Brown, 810 F. Supp. 1258, 1263 (S.D. Fla. 1993)("Boats or other property may be insured at an inflated value to allow for replacement cost, or to cover any mortgage liens that may attach.)  The Court concludes that the fair market value of the Vessel on August 13, 2004, was $165,000.00.

**(6)  The degree of danger from which the property was rescued**: While the Vessel was in peril, the relative degree of danger was not great.  It was at the end of a canal after the hurricane passed.  It had traveled down the canal during the hurricane hitting other vessels and docks, and lodged on a seawall with little exterior damage to itself.  The water was 3-4 feet deep.

While the range of awards as a percentage of salved value have varied from 4% to 25%, Margate Shipping Co. v. M/V J.A. Orgeron, 143 F.3d 976, 994-95 (5th Cir. 1998), the Court finds that the

appropriate percentage under all the circumstances in this case is 10%.  Therefore, the Court finds that a salvage award of $16,500.00 is appropriate.  Having found a salvage award is appropriate, the Court finds that plaintiff is not entitled to recover under *quantum meruit*.[5]

**D.  Liability of Insurance Company:**

Plaintiff's claim against Allstate is premised solely upon Cresci v. The Yacht Billfisher, 874 F.2d 1550 (11th Cir. 1989).  In Cresci a yacht was salvaged and the owner's insurance company retrieved the yacht and returned it to the owner.  The salvor then sued the owner and his insurance company based on common law maritime salvage law.  The salvor's theory as to the insurance company was that his salvage efforts saved the insurance company from having to pay the insured total loss value under the insurance policy, and thus the insurance company received a direct pecuniary benefit from the salvage effort and was liable for a pro rata share of the salvage compensation.  The district court dismissed the claim against the insurance company based on a Florida nonjoinder statute which precluded a suit by a person not an insured until the injured party has first received a judgment against the insured. The Eleventh Circuit reversed, finding that the claim for salvage was not a claim under the insurance policy, as a third party

---

[5]  The Court also notes that plaintiff failed to provide sufficient evidence as to the fair market value of the services rendered.

beneficiary or otherwise. "Rather, appellant asserts an independent cause of action grounded upon the benefit accruing directly to [the insurance company] by virtue of appellant's salvage efforts." 874 F n.2d at 1551. Because of this, the Court found the Florida statute to be inapplicable. The Court continued: "[The insurance company] may have some interest in the salvage of the [vessel] so as to owe money to the one who salvages it. However, the question of whether [the insurance company] owes salvage compensation to the appellant is not presently before us." Id. at 1551.

Plaintiff has cited no case which holds that an insurance company is liable for a salvage award when such liability is not provided in the insurance policy. Florida law generally would not find such liability. Continental Casualty Co. v. Marx, 480 So. 2d 177 (Fla. 3d DCA 1985). This is particularly the case when, as here, the policy caps any benefit to the insured at $100 for an emergency tow if the Vessel became stuck. The Court finds that no cause of action has been established as to Allstate Insurance Company.

Accordingly, it is now

**ORDERED:**

1. Judgment shall be entered on the Amended Complaint (Doc. #23) as follows:

      a.   In favor of plaintiff Boat Raising and Reclamation and against defendant Andrew Patterson as to Count I (Salvage) in the amount of $16,500.00;

      b.   In favor of M/V VICTORY *in rem* as to Count II pursuant to the Order of dismissal (Doc. #48);

      c.   In favor of defendant as to Count III *(Quantum Meruit)*; and

      d.   In favor of defendant Allstate Insurance Company and against plaintiff Boat Raising and Reclamation as to Count IV, and plaintiff shall take nothing from Allstate Insurance Company.

2.   Judgment shall be entered in favor of plaintiff on Counterclaim (Doc. #20).

**DONE AND ORDERED** at Fort Myers, Florida, this ___14th___ day of December, 2007.

_____
JOHN E. STEELE
United States District Judge

Copies:
Counsel of record

-26-